### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| **DEREK CHAPMAN** ) <br> **1435 Tarragon Court** ) <br> **Belcamp, MD 21017** ) <br> ) <br> *Plaintiff,* ) <br> ) <br> **v.** ) <br> ) <br> **MARYLAND DEPARTMENT** ) <br> **OF STATE POLICE,** ) <br> **OFFICE OF STATE FIRE MARSHAL** ) <br> **1201 Reisterstown Road** ) <br> **Pikesville, MD 21208** ) <br> ) <br> *Defendant.* ) <br> ) <br> **Serve:** ) <br> ) <br> **MARYLAND DEPARTMENT** ) <br> **OF STATE POLICE,** ) <br> **OFFICE OF THE ATTORNEY GENERAL** ) <br> **1201 Reisterstown Road** ) <br> **Pikesville, MD 21208** ) <br> ) <br> **and** ) <br> ) <br> **ANTHONY G. BROWN** ) <br> **MARYLAND ATTORNEY GENERAL** ) <br> **200 St. Paul Place** ) <br> **Baltimore, MD 21202** ) <br> _____ ) | **Case No.: 1:23-cv-442** <br><br><br><br><br> **JURY TRIAL DEMANDED** |

### PLAINTIFF'S COMPLAINT
### FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW, Derek Chapman, Plaintiff, (hereinafter "Plaintiff") by and through

undersigned counsel, and complains against Defendant, Maryland Department of State Police,

Office of State Fire Marshal, (hereinafter "Defendant" or "MDSP") and in support thereof states as follows:

## INTRODUCTION

1. On July 15, 2022, the U.S. Department of Justice announced that it had opened a civil pattern or practice investigation into the Maryland Department of State Police ("MDSP") under Title VII due to alleged racially discriminatory hiring and promotion practices.[1] Numerous Black Officers, like Plaintiff, have raised complaints against MDSP for its ongoing and institutional racial discrimination, and several have already filed suit in order to seek justice and bring public attention to MDSP's unlawful practices.[2] ***This case is about when the police are fearful of the police—their own brothers and sisters in uniform.***

2. This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq. ("Title VII"); the Maryland Fair Employment Practices Act, Md. Code § 20-601, et seq. ("FEPA"); the Family and Medical Leave Act ("FMLA"); and 42 U.S.C. § 1983 ("Section 1983") for the Defendant's unlawful harassment, discrimination based on race (African American), color (Black), and retaliation against the Plaintiff, including, but not limited to, Defendants' unlawful and discriminatory preference and treatment, as well as retaliating against Plaintiff for his statutorily-protected activity.

## JURISDICTION AND VENUE

3. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331as it asserts a claim that arises under the Constitution, laws, or treaties of the United

---

[1] U.S. Dep't of Justice, "Justice Department Launches Investigation of Maryland Department of State Police Under Title VII of the Civil Rights Act of 1964" (July 15, 2022), available at https://www.justice.gov/opa/pr/justice-department-launches-investigation-maryland-department-state-police-under-title-vii.
[2] *See, e.g.*, "Maryland State Police troopers allege racial discrimination in a new lawsuit" NPR.ORG (Oct. 26, 2022) available at https://www.npr.org/2022/10/26/1131460772/maryland-state-police-racial-discrimination-lawsuit.

States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq., to redress and enjoin employment practices of the Defendant.

4. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Pikesville, Maryland.

6. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact substantial business in this District, and Defendants maintain employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

7. Plaintiff has exhausted all of his administrative remedies.

8. Plaintiff filed Charge No. 531-2022-01397 with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission (EEOC) on February 18, 2022 alleging race (African American) discrimination, color (Black) and retaliation, and notified MDSP of his filing. He amended the Charge on June 17, 2022.

9. On November 22, 2022, Plaintiff received his Right to Sue letter from the U.S. Department of Justice, Civil Rights Division.

10. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

11. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief

as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

12. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of his constitutional and statutory rights.

13. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

14. Plaintiff, Derek Chapman, is an African American male who resides in Harford County.

15. Defendant, Maryland Department of State Police, is the official state police force of the U.S. state of Maryland.

16. During the relevant period, Defendant employed Plaintiff, Derek Chapman.

17. During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Title VII, the Maryland Fair Employment Practices Act (FEPA), and the Family and Medical Leave Act (FMLA).

## FACTUAL ALLEGATIONS

18. Plaintiff, Derek Chapman, has been employed by Defendant, the Maryland Department of State Police ("MDSP") since 1998.

19. After approximately 22 years of exemplary service with the Office of the State Fire Marshal ("OSFM"), and after rising to the position of the highest-ranking Black person in this Department for the State of Maryland as Deputy Chief State Fire Marshal, Commander of NE Region, Plaintiff was summarily and involuntarily transferred, had a baseless

investigation launched against him, and was subsequently suspended from his employment.

20. As Deputy Chief State Fire Marshal for the Northeast Region, in addition to commanding and managing the State's busiest region of OSFM, Plaintiff was responsible for submitting origin and cause reports to Chief Deputy State Fire Marshal ("CDFM") Gregory Der (Asian, male).

21. The actions taken against Plaintiff were effected due to his race and color, and in retaliation for both raising concerns with his supervisors as to racial issues he has been subjected to from two commanders in the Department, and for requesting additional resources or overtime to handle the workload that corresponded with providing reports while commanding the busiest region in the State.

22. The bullying, harassment, adverse retaliatory actions, and damage to Plaintiff's reputation that he has experienced at the hands of Defendant are part of a larger toxic culture of the OSFM that constitute a hostile work environment.

23. In March 2021, CDFM Der alleged that Mr. Chapman failed to file required reports, despite backlogged reports being a department-wide issue, setting in motion the events that ultimately led to Plaintiff's involuntary transfer, investigation, and suspension.

24. When Plaintiff requested overtime to complete these reports, his request was denied. OSFM subsequently transferred him to a second position without providing him with adequate support to be successful, and then suspended him for failure to submit reports, failure to have his subordinates submit reports, and otherwise neglecting his duty.

25. During a closed-door meeting where Mr. Chapman requested confidentiality, he revealed racial issues that he had experienced with other commanders at OSFM. CDFM Der

betrayed his trust by gossiping to other employees outside of the formal process, solely to intimidate Plaintiff in what was part of a pattern of behavior of bullying, antagonizing and unfair treatment.

26. Until his involuntary suspension, Plaintiff had no performance infractions and had not received any discipline resulting in a loss of pay or warning that would result in termination on further offense.

27. On or around the beginning of February 2020, Plaintiff sent emails to colleagues celebrating the American inventor, Garret Morgan, as part of Black History Month due to his contributions in paving the way for firefighters. The next day, while at a legislative reception with the Fire Marshal, he made a comment in response to Plaintiff's emails. Drawing a problematic comparison between black dogs and a celebrated inventor, who happened to be Black, the Marshal stated that the Department could make a Facebook post about black Labrador retrievers, in honor of Black History Month. Plaintiff was insulted and felt that the Fire Marshal saw him and other Black colleagues as more akin to dogs than as equals to White Officers.

28. Plaintiff was forced to be out on medical leave for much of the following year as he recovered from kidney cancer.

29. Upon his return, the hostile environment intensified in a meeting on March 5, 2021. There, Plaintiff and CDFM Der discussed the alleged backlog of reports due from Plaintiff. Despite backlogs being a department-wide issue, upon knowledge and belief Plaintiff was the only one singled out and subjected to disparate treatment, regardless of him having just returned from leave.

30. Plaintiff explained to CDFM Der the difficulties of running the OSFM's busiest region while catching up on reports. He went on to tell CDFM Der that he needed more resources to comply later that month, but no assistance was provided as CDFM Der denied his requests for resources and for approved overtime. CDFM Der has since told lies about this meeting, claiming that Plaintiff agreed to submit ten reports each month, an unfeasible feat considering his other work duties.

31. Shortly thereafter, Admin Deputy Chief Dexter Hodges (Black, male) informed Plaintiff that the Fire Marshal and Chief Deputy had planned to make unilateral changes to Plaintiff's region, without his knowledge. Plaintiff again was not presented with a valid explanation for why he was being singled out.

32. A second meeting was scheduled with CDFM Der for March 21, 2021. At this meeting, Plaintiff informed SFM Geraci and CDFM Der about two Commanders with whom he had had issues regarding race-related comments made specifically in his presence. He included the February 2020 conversation, under the condition that the meeting would remain confidential. Plaintiff specified that he was not looking to have either Commander punished.

33. The original purpose of the meeting was purportedly to make changes within Plaintiff's region and reassign the tasks to one of the Deputy Chiefs he discussed as having made inappropriate racist comments. At the meeting, in further retaliation, the Fire Marshal stated that he was removing Cecil County from Plaintiff's purview and reassigning it to the Upper Shore office, apparently due to his use of sick leave and his overdue reports. Finally, during the meeting verbal attacks were made on two of Plaintiff's employees, including a threat that one was already being removed from his supervision. SFM Geraci turned on

Deputy John Yedinak, who was the newest member of the region and had been off of probation for approximately 4 months, and started yelling at him for not returning his text while he was on the scene of a burn victim with Trooper One, en route along with additional Deputies to assist. Plaintiff had informed SFM Geraci that night of the status, and he ordered Deputy Yedinak to continue his investigation. SFM Geraci continued to get angry and stood up and stated, "do I make myself clear, do I make myself clear?  I got you those phones and when I call, you answer me." At that point, Plaintiff informed SFM Geraci that he was being intimidating. SFM Geraci replied, "no it's not."  This behavior was witnessed by all sworn staff.

34. On March 22, 2021, Plaintiff received an email from Deputy Chief Duane Svites. In this email, he made a statement paraphrasing a comment made during Plaintiff's supposedly confidential meeting with CDFM Der, thereby signaling to Plaintiff that his complaints were made public.

35. CDFM Der intentionally contacted both Commanders immediately after their meeting and informed them of Plaintiff's statements, according to SFM Geraci. Plaintiff's trust was betrayed, not in pursuit of an investigation or formal process, but simply to make his work environment even more toxic and harder to endure.

36. On June 16, 2021, Plaintiff was immediately, without notice, transferred to Headquarters under the pretext of backlogged reports and relieved of his responsibilities and duties.

37. On August 11, 2021, Plaintiff was given personnel counseling from CDFM Der for not submitting 10 overdue reports to Deputy Chief Duane Svites.

38. One week later, Plaintiff filed a formal internal complaint about CDFM Der. He had previously filed a harassment/discrimination complaint against SFM Geraci and CDFM

Der with the Fair Practice Unit in June 2021, but was informed by the Director of Fair Practice that CDFM Der was not part of the harassment/discrimination allegations.

39. On August 16, 2021, Plaintiff filed a complaint against Chief Deputy Der for violating the Core Values Policy, by lying, misrepresentation of facts, harassment, and bullying.

40. On August 20, 2021, Plaintiff received an email from Captain Rosemary Chappell from the Internal Affairs Division stating that she had received the Blue Team entry involving CD Der and that she would be able to contact him the following week.

41. On August 23, 2021, Plaintiff received an email from Duane Hill Lieutenant Commander of the Personnel Administration Section stating the (IAD) "Internal Affairs Division is in receipt of the plaintiff's BT submission regarding CDSFM G. Der" and that he had been assigned to the complaint. Plaintiff met with Lt. Hill on three separate occasions. Lt. Hill stated that he had spoken with Chief Der and there was nothing he could do.  Lt. Hill understood that the Fire Marshal's Office had a lot of problems and it would take approximately ten troopers to fix all of the problems.

42. On September 3, 2021, Plaintiff attempted to discuss with CDFM Der the approach taken in solving his backlogged reports. CDFM Der responded harshly, coldly and focused not on the solutions or gains that Plaintiff had made, but rather on the problems that he believed remained. Plaintiff was unable to get a fair chance to show realistic improvement.

43. On October 12, 2021, Plaintiff was suspended pursuant to Personnel Order No. 01-21-011. Uniformed troopers were assigned to assist with Plaintiff's emergency suspension, implying that Plaintiff was a hazard and risk. Cpl. Brown and Walters approached Plaintiff's door first and Witmer was holding cover at the mailbox.  Plaintiff invited all of them in, and expressed his feelings about the process.

44. Cpl. Brown and Plaintiff know each other, and he was unsure of why he was ordered to assist. At 3:03 PM Cpl. Brown asked Walters if they would be "okay," and Walters replied, "yeah, we're good." At that time, Plaintiff continued to remove his items from the passenger compartment.

45. At 3:24 PM, Walter and Witmer left Plaintiff's development and he continued to move his items from his porch into the house. After all of Plaintiff's items were removed and placed on his porch, it gave the impression that some type of crime had taken place. The mailbox carrier for Plaintiff's address later approached him and stated that she had witnessed the event and it "did not look good."

46. During this time, a detailed report was created and placed in Plaintiff's personnel file, and he was later questioned about his comments by the Office of Equity and Inclusion Deputy Director Atto Commey during an interview. Mr. Commey informed Plaintiff that he should keep his mouth shut and this would cost him money.

47. On October 28, 2021, Plaintiff made contact with the Legislative Black Caucus of Maryland and a meeting was scheduled with the Chairman in his office in Annapolis on November 2, 2021. During the meeting, the Chairman informed Plaintiff that he thought this was taken care of and that he would make contact with Col. Jerry Jones the Maryland Department of State Police, Superintendent.

48. On December 7, 2021, an Internal Affairs investigation was launched against him for the same failure to complete reports, again a Department-wide issue that upon information and belief only he was singled out for. In addition, the original investigation complaint against CD Der was incorporated with the Plaintiff's investigation and given a case number.

49. On December 15, 2021, an Internal Affairs interrogation took place at IAD/HQ. During the interrogation, Plaintiff's counsel informed Lt. Hill that a personal counsel was given prior to these charges. Lt. Hill replied he was aware.

50. On March 16, 2022, Plaintiff had a phone conversation with SFM Geraci in which he told Plaintiff he had been reinstated, and would need to get caught up on training and firearms. SFM Geraci told Plaintiff that they would talk about reports after all of that had been completed, and that he could work at Headquarters or wherever he felt comfortable.

51. On March 24, 2022, Plaintiff received an email from SFM Geraci titled "Moving Forward" in which he accused Plaintiff of being disgruntled and gave him a timeframe to get reports completed, no matter if he was on approved leave or not.

52. On May 10, 2022, Plaintiff discovered that his personal and work items had been removed from his Elkton office to the Bel Air Office without his knowledge or consent. He emailed SFM Geraci, D.C. Mowbray, and Hodges requesting to know who had moved the items and why, attaching a photo of his belongings piled on the floor, unsecured. SFM Geraci indicated that his temporary transfer was now permanent and claimed that the office he had occupied was needed for evidence storage. However, Plaintiff believes that the move was deliberately done prior to the start of business to conceal it from the Senior Deputies. None of the NERO staff were aware of any such request to convert a storage area into evidence storage, and the room in question does not meet the requirements to store evidence.

53. On May 18, 2022, Plaintiff sent a text message to the newly promoted Chief Deputy Jason Mowbray to congratulate him on his promotion and ask him to call him when time permitted in order to have the opportunity to come to a clear understanding of the events which had taken place prior to his promotion.

54. On May 19, 2022, Plaintiff received an email from Jessica Carter in the Medical Division regarding a mandatory medical evaluation.

55. On May 20, 2022, Plaintiff received an email from Chief Deputy Jason Mowbray requesting that he have his items moved by Friday, May 27, 2022. 17.

56. On June 16, 2022, Plaintiff met with CD Mowbray alone in the Headquarters conference room. During the meeting, they discussed communications between CD Mowbray and Plaintiff currently and prior to CD Mowbray's promotion, submittal of reports, and Plaintiff's concerns with the way the issue had been handled prior to CD Mowbray's promotion, and the fact that Plaintiff was aware of FM Geraci's statements in the last Command Staff meeting that Senior Deputy Carl Witner was unable to work at night due to a medical condition and therefore he was trying to save his job. FM Geraci also stated in a prior Command Staff meeting that Plaintiff's return was "an if, and I mean a big IF".

57. CD Mowbray had received Plaintiff's performance evaluation (PEP) from FM Geraci, indicating that Plaintiff's overall rating was Unsatisfactory. Plaintiff informed CD Mowbray that it was not filled out correctly, and FM Geraci did not have sufficient grounds for issuing such a rating. CD Mowbray agreed and returned the PEP to FM Geraci for comments for the "1" ratings previously given without comments. FM Geraci added those comments, and Plaintiff signed the form after adding his own employee comments.

58. Plaintiff further informed CD Mowbray that he would be forwarding these events to the Department and to his legal counsel.

59. On February 13, 2023, while on FMLA leave pending a surgical procedure and one day before his birthday, Plaintiff received a letter containing a performance evaluation dated

December 14, 2022 rating his performance as unsatisfactory, highlighting his reports as an ongoing area of concern and claiming that he was failing to follow orders.

60. Upon information and belief, the following similarly-situated Officers have received more favorable treatment than Plaintiff under similar circumstances:

- Jason Mowbray, Deputy Chief, (White, male) – Deputy Chief Mowbray was permitted to serve on an interview panel for new employees after Plaintiff was removed from his panel. Each Deputy Chief serves on the hiring process for new employees within their region. On one occasion, an employee was fired due to an out-of-state charge. Once Plaintiff informed CD Der that the employee would be reapplying due to the charges being dropped, SFM Geraci changed the policy stating "if any applicants are known to any of the panelists they must recuse themselves."

- Prior to Plaintiff's promotion, all Deputy Chiefs assigned to the Northeast Region were White males: Matthew Stevens and Sander Cohen (deceased L.O.D.D.). The average backedlogged reports remained the same and the White commanders were never charged pending termination as Plaintiff was.

61. The Plaintiff has consistently been the target of race and color discrimination and retaliation.

62. More specifically, the Plaintiff faced continuous and relentless harassment from superior Officers, in contrast to the treatment experienced by White Officers, leading to his involuntary transfer, investigation, and suspension. The severity of these adverse actions increased after the filing of his internal complaints with the Fair Practice Unit. The

aforementioned misconduct was so egregious and pervasive that it has affected the Plaintiff's mental, emotional, and physical wellbeing in irreparable ways.

63. Plaintiff was forced to file suit due to the Defendants' inability to remedy their unlawful conduct that has cost Plaintiff significant financial strain as well as emotional distress.

64. The Defendants' discriminatory and retaliatory practices have been effectuated in violation of Title VII of the Civil Rights Act and the Maryland Fair Employment Practices Act (FEPA).

<u>**COUNT I**</u>

**VIOLATION OF TITLE VII – RACE DISCRIMINATION**

65. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

66. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

67. Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is African American, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified police officer, as he has over twenty-two (22) years on the force and maintained the title of Deputy Chief State Fire Marshal for the Northeast Region. The Plaintiff suffered adverse employment actions directly related to his position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964 when he was repeatedly discriminated against and harassed by his Caucasian male supervisors, involuntarily

transferred, investigated for backlogged reports despite having been on medical leave and the fact that similarly-situated Caucasian Officers were not also investigated for the same, and suspended. CDFM Der, along with SFM Geraci and other representatives of MDSP, have subjected Plaintiff to a pattern of discriminatory, disparate treatment that stands in stark contrast to the more favorable treatment received by similarly-situated Caucasian officers as asserted above.

68. Plaintiff is a member of a protected class as an African American man.

69. Because of his race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

70. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

71. Defendant knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his race.

72. Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his race.

73. Defendant reprimanded Plaintiff in a way that deprived him of workplace safety and otherwise adversely affected his status as an employee because of his race.

74. Other employees who were similarly situated, but were non-African American or Caucasian individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

75. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

76. Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

77. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

78. Further, Defendant's treatment and actions are ongoing.

79. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

80. Similarly, situated non-African American Caucasian employees were not subjected to the same, similar, or adverse treatment like Plaintiff, and have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

81. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

82. Defendant discriminated against Plaintiff because of his race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

83. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

84. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

85. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

86. Maryland Department of State Police must comply with Title VII, but by and through their conduct, have violated Title VII.

## COUNT II

**VIOLATION OF TITLE VII – COLOR DISCRIMINATION (BLACK)**

87. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

88. A *prima facie* case of color discrimination requires a showing of four (4) elements: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

89. Here, the four (4) elements of a *prima facie* case of color discrimination are met. The Plaintiff is Black, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified police officer, as he has over twenty-two (22) years on the force and maintained the title of Deputy Chief State Fire Marshal for the Northeast Region. The Plaintiff suffered adverse employment actions directly related to his position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964 when he was repeatedly discriminated against and harassed by his White male supervisors, involuntarily transferred, investigated for backlogged reports despite having been on medical leave and the fact that similarly-situated non-Black Officers were not also investigated for the same, and suspended. CDFM Der, along with SFM Geraci and other representatives of MDSP, have subjected Plaintiff

to a pattern of discriminatory, disparate treatment that stands in stark contrast to the more favorable treatment received by similarly-situated non-Black officers as asserted above.

90. Plaintiff is a member of a protected class as a Black man.

91. Because of his color, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

92. Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

93. Defendant knew that Plaintiff was Black prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his color.

94. Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his color.

95. Defendant reprimanded Plaintiff in a way that deprived him of workplace safety and otherwise adversely affected his status as an employee because of his color.

96. Other employees who were similarly situated, but were non-Black or White individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

97. Plaintiff's color was a determining factor in Defendant's unlawful conduct toward Plaintiff.

98. Plaintiff's color was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

99. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

100.     Further, Defendant's treatment and actions are ongoing.

101.    Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

102.    Similarly, situated non-Black White employees were not subjected to the same, similar, or adverse treatment like Plaintiff, and have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

103.    Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his color.

104.    Defendant discriminated against Plaintiff because of his color by engaging in, tolerating, or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

105.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

106.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

107.    Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

108.    Maryland Department of State Police must comply with Title VII, but by and through their conduct, have violated Title VII.

## COUNT III

### VIOLATION OF TITLE VII – RETALIATION

109.     Plaintiff re-alleges and incorporates by reference each and every allegation in the

paragraphs above, as if fully set forth herein.

110.     Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing]

against any individual with respect to [his] compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex, or national origin,"

42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity

protected by Title VII, id. § 2000e–3(a). To that end, an employer may not create or

condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank,*

*FSB v. Vinson*, 477 U.S. 57, 64–65 (1986).

111.     Here, the Plaintiff faced retaliation for the complaints he submitted internally with

the Department, and then externally with the EEOC.

112.     Soon after complaining, Plaintiff was subjected to the unlawful conduct and

adverse actions alleged throughout this Complaint in violation of Title VII. Such acts not

only constituted adverse actions against Plaintiff, but also created a profound chilling effect

in which Plaintiff feared swift retribution for pursuing his case to the fullest extent.

113.     Defendant subjected Plaintiff to the aforementioned adverse employment actions

because of his opposition to the unlawful and discriminatory employment practices of

Defendant in violation of Title VII.

114.     Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in

protected activity prior to engaging in the aforementioned adverse actions when they were

informed by Plaintiff directly, advised by an EEOC representative, or otherwise should

have known that Plaintiff engaged in the complaint process based on his informal and formal complaint filings. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

115.     Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

116.     Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

117.     Similarly situated employees (no known prior EEOC activity) were not subjected to the same, similar, or any adverse treatment.

118.     Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

119.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

120.     Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

121.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

122.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

123.     As a direct and proximate cause of Defendant's conduct alleged throughout this

Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary

damages – including but not limited to past and future loss of income, benefits, career

opportunities, medical expenses and costs – and is entitled to all available legal and

equitable remedies.

124.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain

and suffering, and her injury is permanent in nature. Further, Defendant's treatment and

actions were ongoing.

125.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and

loss of career opportunity now and into the future, and all of the other losses stated with

Plaintiff contributing in any way thereto.

126.     Maryland Department of State Police must comply with Title VII, and by and

through their conduct, violated the law.

## COUNT IV

**VIOLATION OF MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA")**

127.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs

as if fully set forth herein.

128.     The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State

Gov't, § 20-601 et seq. outlaws discrimination in employment based on race, color,

religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic

information, or disability by employers with more than 15 employees.

129.     Under FEPA, an employer can be held legally responsible if the person responsible

for the harassment can make or recommend employment decisions (e.g., hiring and firing,

promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

130.    Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

131.    The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race (African American) and color (Black).

132.    Under the 2016 revised standard of LGTCA §5-304(e), this Court has found that an EEOC Charge is sufficient to satisfy the notice requirement of the LGTCA because "it provided the County with 'actual or constructive notice' of 'the claimant's injury' or 'the defect of circumstances giving rise to the claimant's injury' within one year of that injury." *See Hine v. Prince George's Cty.*, 2021 U.S. Dist. LEXIS 236854 * 10-1 (D. Md.); see also Md. Code Ann., Cts. & Jud. Proc. § 5-304(e) (codifying the concept of substantial compliance by stating that "this section does not apply if, within 1 year after the injury, the defendant local government has actual or constructive notice of: (1) the claimant's injury; or (2) the defect of circumstances giving rise to the claimant's injury"). In the present case, the first meeting with CDFM Der occurred in March 2021 and Plaintiff filed his EEOC Charge detailing his injury at the hands of Defendant by February 18, 2022—within the year notice requirement of the LGTCA. As such Plaintiff has properly brought his claim under FEPA as an employee and complied with the Local Government Tort Claims Act.

## COUNT V

## FAMILY AND MEDICAL LEAVE ACT ("FMLA") RETALIATION

133.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

134.     Retaliation claims under the FMLA and Title VII are analyzed under the same burden-shifting framework of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L. Ed. 2d 668 (1973). *Yashenko v. Harrah's NC Casino, Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006); *Howerton v. Board of Educ. of Prince George's Cty.*, No. TDC-14-0242, 2015 U.S. Dist. LEXIS 109787, 2015 WL 4994536, at *17 (D. Md. Aug. 19, 2015).

135.     Under this framework, Plaintiff must first establish a *prima facie* case of retaliation. To establish a *prima facie* claim of retaliation, a plaintiff must show that "(1) [he] engaged in protected activity; (2) the employer acted adversely against [him]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)).

136.     Plaintiff engaged in protected activity by reporting several instances of misconduct that occurred in the Department, including but not limited to, racial harassment, discrimination, and abuse of power.

137.     The Defendant responded to these reports by unlawfully and arbitrarily taking adverse actions against Plaintiff during his medical leave of absence and subsequently punishing him for failing to deal with a backlog of reports while on FMLA leave due to kidney cancer, and later involuntarily transferring him and reducing his responsibilities due

to his use of FMLA leave. Most recently, Plaintiff received an unsatisfactory performance evaluation on February 13, 2023, delivered one day before his birthday and before the surgical procedure he was scheduled to undergo, despite being dated December 12, 2022.

138.    There is a direct, causal connection between Plaintiff's protected activity and the immediate retaliatory misconduct of the Defendant of prohibiting his entitled use of FMLA leave.

139.    Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

<u>**COUNT VI**</u>

**SECTION 1983 CLAIM FOR VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER SECTION 1981 OF THE CIVIL RIGHTS ACT**

140.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

141.    Plaintiff brings claims of race and color discrimination and retaliation against Defendant for its violations of 42 U.S.C. §1981 through 42 U.S.C. § 1983, for the deprivation of his property and liberty interests as protected by the 14th Amendment to the U.S. Constitution and these federal statutes, and for the violation of his freedom of speech and freedom of expression under the First Amendment to the U.S. Constitution by Defendant and its named Responsible Management Officials for its acts of retaliation in violation of 42 U.S.C. § 1981 through 42 U.S.C. § 1983.

142.    Section 1983 provides an individual the right to sue state government employees and others acting "under color of state law" for civil rights violations.

143.    The Defendant, and its responsible management officials, under 42 U.S.C. § 1983 are persons who acted "under the color of state law."

144.     Defendant unlawfully deprived Plaintiff of his civil rights in violation of Sections 1981 and 1983 of the Civil Rights Act and the First and Fourteenth Amendments when it retaliated against Plaintiff for having engaged in protected activity by complaining of discrimination on the basis of his race, thereby punishing Plaintiff for exercising his rights and discouraging him as well as others from continuing to exercise such rights in the future.

145.     Defendant treated Plaintiff disparately or pretextually in the terms and conditions of his employment compared with the way non-African American and non-Black employees, or employees that had not engaged in protected activity, were treated.

146.     Plaintiff alleges that as a result of his being African American, Black, or because he engaged in protected activities, he was illegally harassed, subjected to a pattern of harassment and disparate treatment, involuntarily transferred, investigated, and suspended by Defendant.

147.     The acts described above are part of an institutional practice or custom, constituting an official policy of the Maryland Department of State Police to cover up employee misconduct, discrimination, and retaliation against fellow employees who stand up against the MDSP for violations of their civil rights that should protect them from discrimination and retaliation in the workplace.

148.     At all times relevant hereto, Defendant acted pursuant to a custom or policy of the Maryland Department of State Police.

149.     Defendant failed to adopt clear policies and failed to properly train its management officials in handling, managing, and protecting employees who engage in statutorily-protected activities within the school system.

150.     As an African American man, Plaintiff is a member of a protected class.

151.     As a Black man, Plaintiff is a member of a protected class.

152.     Because of his race, color, and engagement in statutorily protected activities, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1983.

153.     Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

154.     Defendant knew that Plaintiff is African American and Black prior to the adverse actions described throughout the Complaint, and was aware or should have been aware of the discrimination Plaintiff was subjected to because of his race and color.

155.     Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his race and color.

156.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived his of employment opportunities and otherwise adversely affected his status as an employee, because of his race and color.

157.     Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than the Plaintiff in the terms and conditions of employment.

158.     Plaintiff's allegations clearly show a custom of discrimination as required by Section 1983.

159.     Plaintiff's race and color were a determining factor in Defendant's unlawful conduct toward Plaintiff.

160.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

161.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race and color.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Derek Chapman, respectfully prays that this Court grant him the following relief:

a.  Enter a declaratory judgment finding that the foregoing actions of Defendant violated Title VII, FEPA, the FMLA, and Sections 1981 and 1983;

b.  Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c.  Award back pay and compensatory damages in the amount of $4,800,000 (four-million, eight hundred thousand dollars and zero cents) that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e.  Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.


Dated: February 17, 2023

Respectfully submitted,


By: <u>/s/ Dionna Maria Lewis</u>
Dionna Maria Lewis, Esq.
Bar No. 19486
District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite2098
Washington, D.C.20003
Tel. (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Derek Chapman*